for argument in In Re Lehman Brothers Holding, Shinhan Bank versus Lehman Brothers Special Financing. Good morning, your honors. May it please the court. Judge Carney, Judge Hull, Judge Codal, I'm John Bix from K&L Gates, LLP. Very pleased to be here this morning arguing for the appellant, Shinhan Bank, in this matter. Good morning, Mr. Bix. Your honors, this case presents a dispute that's been before this court a number of times. Not this dispute, precisely, but this type of dispute. When should parties to a fully negotiated but unsigned settlement agreement nonetheless be held to that agreement? In this case, the parties, after agreeing to a single term of a settlement following mediation, that being the settlement amount, the parties thereafter set about negotiating a complete written agreement to document their understanding at a full settlement. That agreement, however, was never signed by Shinhan, and that's the circumstance that we find ourselves in today. When you say fully negotiated, does that mean that there were no material terms that were left? Yes, your honor. Both parties agreed that the agreement at that point reflected their complete understanding and was awaiting only the execution of the parties. And among the terms, happily for Shinhan, that are included in that agreement, based on this court's longstanding approach from Winston, were a number of express reservations in which each of the parties agreed that neither of them would be bound until the agreement was fully executed. That provision appears in section four and in section five of the agreement. That appeared in the draft agreement as later prepared, but didn't people leave their communications with the mediator understanding that the core, the material term, the amount, was agreed to by both parties, and that the rest was relatively routine? No dispute that the parties left the mediation with the agreement that the settlement amount had been resolved. But in the mediator's correspondence, well, and actually to be precise, when we left the mediation, actually nothing was resolved, the mediator had given the parties a suggested number and gave them a period of time to consider whether they would agree to it. The parties actually, our client, requested some additional time beyond the time the mediator originally granted. But by April 20th of last year, both parties informed the mediator by email that they were in agreement with the settlement amount. What's really crucial is the correspondence that the mediator sent out that day, as soon as he heard that, what he said that day, and what he sent out. And of course, it's in the record in the joint appendix. The mediator's communication to the parties says, not verbatim, I'm pleased to announce that both parties have accepted the settlement amount. Because Lehman has routine settlement documentation, I would ask them to send it to Shannon for its review. He then tells the parties to please conclude this matter promptly and advise me of any problems. What is the only thing that you can take away from that is exactly what we and Lehman understood at that time. Yes, we had agreed to the settlement amount. And yes, there would also be a complete written settlement agreement resolving this dispute. I think that's a quick, go ahead. I think that's equivalent to an express reservation of rights, that there is no settlement absent a writing signed by both parties. So I guess what I would say is, if the correspondence of that day is not an express reservation, it is at a minimum the kind of implicit reservation that Judge Codal, when you described in American Express v Lindner, when you talked about looking at the words and deeds of the parties to understand whether even if at that moment you didn't see an express reservation, if there was certainly enough to determine that there had been an implicit reservation. Winston and its progeny stands for the proposition that you can have an enforceable agreement, even though you expect that there will be a future writing to reflect that agreement. You concede that there were no material terms left to be negotiated, and then you rely really almost only on the proposition that the drafts that came out included some reservations in sections four and five. But sections four and five don't have the kind of overarching we're not bound until there's a final written agreement. They appear to be directed to the releases rather than to the entire agreement. Certainly, they appear to be less definite than the reservation in Camarche that you rely on. So, Your Honor, I'd say a couple of things. First, that is very much the same argument that the district court relied on in Kazmarsk in enforcing the agreement, and when this court then in Kazmarsk overturned the district court's view, it explicitly found that this language, reservation like this, doesn't, as the district court had said in Kazmarsk, merely talk about when the party's obligations begin to unroll, as this court noted in Kazmarsk. That reservation of language is actually crucial to the date and time that the language is formed. I'd note also, you noted those two reservations in sections four and five. The agreement is replete with other information that not only suggests, I think it demonstrates conclusively, that these parties intended that this agreement, the four corners of this document, was their entire agreement. It contains, of course, a very standard merger clause, an integration clause. Makes super clear that this, and it says in simple declarative sentences, these parties- All these agreements contain those sorts of things. Let me ask you this about, your firm was involved in the negotiations, right? It worked. And on June 28th, counsel sent an email saying you'll have everything on June 30th, right? All correct. All correct. Was it lying? Wasn't lying. But an interesting thing happened on the way to the courthouse. The communication that we sent them on June 28th said our client has completed their internal review. We expect they will sign it on Thursday. Within hours after our saying that, the bankruptcy court came down with its decision on motion to dismiss. Of course, we didn't know when that was coming. Lehman didn't know when it was coming. Lehman would suggest to you now that there's sort of a moral hazard component here and that Shenan throughout the process had been dragging its feet. First of all, there's nothing in the record that supports that. But more to the point, what would be the point of dragging our feet? We didn't know when the bankruptcy court was going to rule and we certainly didn't know how she was going to rule. And just another point, we did not, there was no discovery taken in the litigation of this matter in the bankruptcy court. We and Lehman agreed that there were no disputed facts to be resolved. So we just proceeded on a record of undisputed facts. Because we didn't take discovery, I know what we knew on the morning of June 28th before that decision came down. But what I don't know, I don't know what Lehman knew, I know what we knew. So when Lehman reached out to us on the morning of June 28th with another ping saying, do you know if this has been signed yet? As I say, I know it was in our mind, I don't know what was in theirs. And so, I know your red light is on, but both sides appear to agree that there was no part performance. But after you had agreed that you would sign the agreement, that the agreement was about to be signed, out comes the decision dismissing Lehman's claim, that removed certainly a substantial part of what was bargained for in the releases. Are we supposed to just ignore that as though it never happened? As though it didn't affect the existence of the agreement? Can't we include that as part of partial performance? And is there any case which is similar, where there's such a dramatic change after the parties have agreed and they're going to sign off on the agreement, such a dramatic change in what was bargained for, where the courts just say, sorry, we'll just ignore it. So I guess I would point to Charamella, where Mr. Charamella, with his first counsel, had stood up in open court and agreed to a deal that apparently he was ready to take. Wasn't until he consulted with a separate attorney that he frankly just changed his mind. It may be it's an overly simplistic analysis, but if you want to, I suppose you can look at this case in saying, Shannon just changed their mind because the facts changed. And again, back to Lehman's moral hazard argument. The way this agreement was constructed, essentially, because of these express reservations, effectively it provided each party with an option to perform, to participate, until the moment that party signed. It was always constructed that way. Lehman was under that term just as we were. If Lehman had been so concerned that we were slow rolling this at any time during our five or six week negotiation, they could have said, putting an outside date on this. If you don't get this executed by a certain date, they never did that. The reason they didn't do that is they weren't thinking any more than we were about trying to game what the bankruptcy court was going to do. No one knew when the bankruptcy court was going to rule, of course, how she was going to rule. They trusted you. And we trust them. It's a pleasure dealing with them. And this, I will confess, your honors, in over 30 years of practice, this case put us in an interesting position, but we have to follow the law. And the moment this decision came down, I can assure you the very first thing we did was I had some of the folks who work with me hit the books. I never had occasion to look at this before, but it is stunning when you look at Winston and you look at the progeny of Winston over 30 years. There's not a lot of areas of law where you can sort of lay a ruler straight across what the holdings are. But I would submit that if you look at Winston, Charmella, Kasmarsic, the cases that flow from them, it is a laser straight rule. And that rule is, if you want to know when parties to an agreement intend to be bound, look at what they say, where you can find a clear reservation, that ends the analysis. And I would respectfully submit that this is one of those cases where you could not have- Absolutely, and again, as the cases say, it does not matter when that signal is given. But I would say, just as we talked about earlier, in fact, that signal was given in the mediator's very first communication to the parties, where he indicated, great, we've got an agreement on the settlement amount, now let's get this wrapped up. And our review is de novo? Yes, the factual issues are all agreed. Thank you. Thank you. We have some time for rebuttal. Mr. Cox? Thank you, Your Honor. May it please the court, Christopher Cox for Eppley Lehman Brothers. Your Honor, I'd like to pick up where Mr. Bix left off, if I may, and we'll talk about your question, which is basically, when do you look to determine whether or not there's been an express reservation of right not to be bound, absent of formal writing? You look at the communications and the conduct of the parties. And if you look at the record here, it's unequivocal and unreserved when Shinhan accepted the settlement proposal from Judge Mabee, who was our court appointed mediator, it was unconditional. And if you look at all the communications between the parties leading up to the reneging on the deal, it was always, we have a deal, we're going to sign the release. There was never any expression to say, we reserve our right to withdraw if the bankruptcy court rules in our favor on the motion to dismiss. There's nothing like that. What we have here is, it's covered exactly by Powell, the Powell case, where what we had is we had a complete settlement. And this wasn't simply one term. I'm not sure you can say that it was really complete. I mean, there was a number that was agreed to, and presumably it was a fairly large number given that the claims here, that's a sealed matter, but where such a large number was at stake, and there was no written or expressed statement that, of course, we don't have a deal until we have a deal and it's signed. And were there things like the identification of the actual settling parties, the terms of payment? I mean, you weren't trying to enforce payment the day after the number was reached. And that's because there were significant issues, maybe less significant than the number, but there were still items that had not been agreed to. Isn't that right? Why am I wrong in thinking of it that way? You're wrong, Your Honor, in the facts of this case. I know that Shinhan makes that argument, but we have to understand the context of where we are, right? So first, this mediation proceeded under the auspices of the bankruptcy court under the ADR procedures order, which required each party to send a representative with full authority to bind their party to a settlement. We had a mediation, and then Judge Mabee gave us a reasoned settlement proposal. We cannot disclose it. We couldn't even disclose it to the bankruptcy court because it's confidential, what was exchanged in the mediation. But it was a reasoned opinion from Judge Mabee that said, this is where you should settle at, and this is why. And the settlement terms are very obvious, and Judge Chapman brought it up in her bankruptcy court opinion, which is basically, they pay X amount of dollars, we give them a release. And if you look at all the subsequent negotiations, it was really implementing the settlement. It was executing on the release. That's why the release agreement is called a release agreement, not a settlement. Should we apply a different analysis in the context of a settlement agreement reached in this mediation context than we do in ordinarily contract negotiation? Looking at kind of the course of negotiations to determine when the parties had reached an enforceable agreement. I think we should apply the law as it is, which is basically, if you look at the opinions that are being relied upon by Shinhan,  And as Judge Chapman said here, this is the simplest form of settlement. It's not payments over time, it's not anything further than you pay X money, you get a release. If that's so, why was no action taken immediately after the number was reached and that was announced by the mediator? There was action. Why were there five weeks of negotiation? It wasn't five weeks of negotiation, Your Honor. If you actually look at the record, the next day after Judge Mabee confirmed that both parties agreed to a settlement proposal unconditionally, Lehman sent over the release agreement, and we waited for Shinhan to respond. And what they responded to wasn't on material terms. It was essentially, how long between the settlement, the payment of the settlement amount, do you have to, well, let me take that back. How long do you have to wait until the settlement amount is paid? Yeah, how do you, and it went- It went in ten days. We proposed five days, they asked for ten days. But was it immaterial that, if the settlement was going to be governed by South Korean law? That was never a discussion, Your Honor. That never came up. It was- So the governing law was not- Governing law was New York, that was in the initial proposal, that's what it was. Was that immaterial to Lehman, what the governing law was going to be? With regard to the release agreement, we wanted to have New York law because this was reached in New York, the agreement was in New York, and it was governed, and it was in court in New York. But you're not saying it was immaterial. I'm saying it might be material to the release agreement. It's immaterial to the settlement, which was full and binding as of April 20th. Because this isn't a situation where you had any ongoing obligations between the parties over time, such that you needed to negotiate material terms. But I'm not sure how I understand how you can really separate the settlement from the release. The settlement has no value without a release. I think we should go back to Powell, Your Honor. Because the Powell case says, continued negotiations over the performance of the settlement, rather than assent to its terms, is different. And that's what you see here. There's negotiation over the performance of the settlement, and that's exactly what the release agreement was intended to do, and that's why it's called the release agreement. I know Shinhan has asked that the court rewrite that to say it's a settlement release agreement. But what it is, it's an agreement on the performance of the settlement. It's not an agreement to the terms of the settlement, and that's an important distinction. Do you agree that there was no partial performance here? No, Your Honor. If you actually look at footnote eight of our brief, we do think there was partial performance. It's just that the district court disagreed with us. We don't think it's dispositive of the issue. What's the partial performance? Well, the partial performance here, Your Honor, is we had to provide a release in exchange for the settlement. And what happened here is, Shinhan said, we don't want to exchange electronic copies. We want you to sign two originals and send them to us. At the time we placed those agreements in express mail to Shinhan, we were bound to the release. We had no way to get out of it. And so we performed by signing that agreement saying, immediately upon payment, you're released. And within seven days, we're going to file a motion to dismiss. We were bound. That was our only obligation under the agreement. Now, the district court disagreed with us. We do think there's partial performance here. But, as I said, I don't think it's dispositive. How do you distinguish Kamarczyk? Well, Kamarczyk and Sia Morella are two cases where they were actively negotiating the terms of the settlement. And if you actually look at the opinions- What was open in those cases? Just remind me. Well, two were, first of all, it was a settlement agreement that was being negotiated. Now, because Kamarczyk, what they said in that case was, while they were negotiating the terms of the settlement, they put in this provision that said, the settlement's not binding until both sides sign the agreement. And the court found that was important. Here, we had a, and the bankruptcy court and district court agreed with us, here we had a binding settlement where we agreed on all material terms. And when we put in a very standard merger clause and execution, what that meant when we said this is effective upon signing means it's effective, meaning it gives you the dates as to when Shinhan is supposed to pay. It gives us the date as to when the reservation of rights is there. And any other agreements previously don't count, which means when we propose five days, it's now ten days. We agree it's ten days for them to pay. But it had nothing to do with assent to the material terms of the settlement or meeting of the minds on the settlement. That's completely different, and that's what distinguishes the cases that Shinhan's relying on. Whereas the cases that we've cited, which is the Walker case, the Deleonis case, and the, I'm going to butcher. Yes, those cases all show that there's a difference between implementing a formal writing to memorialize the settlement that's already been reached, versus negotiating the terms of the settlement, and that's where we are right here. And counsel for Shinhan said that he's following completely second circuit law, but we are too, because it's an important distinction here that Shinhan's failing to recognize, which is we're in the situation here, which is fully supported by second circuit authority, that all we agreed to do was reduce the performance of the settlement to a formal agreement to implement what we had already agreed on. And before I run out of time, Your Honor, I do want to address one other policy consideration that's really important here. You can have a little more time, Mr. Briggs. Got some time and he's going to get rebuttal. Thank you, Your Honor. So here, what we have to do is keep context, right? Where the Lehman bankruptcy was the largest bankruptcy in history. The bankruptcy court had to manage thousands and thousands and thousands of counterparties. And so what the court did is it implemented what's called the SPV ADR order, which basically appointed four court-appointed mediators. Judge Mabee was one of them, and said, when you show up at the mediation, you need to have authority to bind the parties. And so when Judge Mabee said, I have a proposal, and everyone agreed to that, that was binding on the parties. Did Lehman, in all of these mediations, ever do a settlement that wasn't memorialized in writing? The routine settlement documentation that you see from Judge Mabee, it's typically the release agreement. And then there are other things you have to do in the bankruptcy court with regard to this. Was any settlement ever accomplished without a writing? No, I don't think so, Your Honor. It's a fair question. But here, when a court orders the parties to show up with a representative who can bind the party. And that representative says, I agree to the settlement. The court cannot come back and undermine the bankruptcy court's authority to require people to bind the parties when they agree to a settlement. There's a policy reason here. And we mentioned it in our brief, which is this heads I win, tails you lose situation. Where Lehman was induced into signing the agreement and being bound by it. And Shinhan wants to back out of it now because they had a change of heart. And a change of heart does not overcome a final binding agreement. And that's exactly what we have here, and Mr. Bix told you. We agreed to everything. The game changer was the judge ruled in our favor, right? And so, I'm out of time, Your Honor, so thank you. Thank you, Mr. Cox. Mr. Bix, you've reserved three minutes for rebuttal. Thank you, Your Honor. I want to go right to this argument that somehow Lehman is bound to the release because they signed it and we did not sign it. It's an absurd proposition, we've never suggested that, and it would be wrong to do it. There was no consideration supporting the release. Could you address the argument, though, that this is a special context in which parties were ordered to show up with individuals who are authorized to settle. And that there's an institutional interest in enforcing settlement agreements where we have a huge bankruptcy, there are a lot of parties involved and so on. And that maybe we apply a somewhat more relaxed standard about what the other terms are than we would in an ordinarily commercial venture that was just undertaken by two parties separate from the bankruptcy. Sure, and this is the largest bankruptcy case, the most complicated case that's really ever come down the pike. That doesn't make it special, and the fact that parties were directed to have party representatives with authority to bind at the mediation is certainly not unusual to Lehman. You will have seen that many times before. We did have representatives from Shenan, two of them, who flew halfway around the world to attend that mediation. So we attended that mediation in good faith, and we accomplished something out of it. At least we got part of the way there, because we agreed on the settlement amount. And you've agreed that there were no material terms left to be negotiated. Not only do we agree that there were no material terms left to be negotiated, the obverse, we agree all material terms were agreed, including, we say, most importantly, that the parties agreed that neither one nor the other would be bound until the agreement was fully executed. I also want to note, Judge Carney, you asked the question. I'm sorry. That term, that neither side would be bound until there was a written agreement, was certainly not expressed in the agreement to the terms that the mediator put out, right? So I would say- Mediator said, agreement, both sides agreed. What the mediator- He was hiding at that time. No, we're not actually bound until we sign off on the written agreement. So two things. It's important. The only term that was agreed on April, following the discussions, on April 20th, the only term that was agreed was just to the settlement amount. Term, not terms. And Judge Carney- Are you backing away from your yes answer to Judge Codall's earlier question that there was nothing left to be negotiated? No. I'm sorry. When you said nothing enough to be negotiated, I thought you meant after the parties had concluded the negotiation of the draft written agreement. I apologize. There was plenty left to be negotiated after April 20th. And Judge Carney, this is exactly to the question you asked. I mean, something as simple as, when do they expect to get paid? If you assume that we agreed, as everyone agrees, that we agreed on April 20th as to what the amount would be to pay to settle. We had absolutely clearly agreed to exactly nothing else. Including in things like, well, when exactly were you going to pay us? What if we had said, well, you know, our idea is we're going to pay in 15 years, is that okay with you? And your question, what governing law was there going to be? Well, our client is one of the largest banks in Korea, perhaps they would have wanted to have Korean law. And you asked Mr. Cox a question, has Lehman ever agreed to settle one of these cases on a wink, a nod, and a handshake? Of course not, they know how to do this. These are high grade professional lawyers in a complicated bankruptcy case. So I need to go back to a minute. I understood Judge Codal to be asking you whether there were any material terms left to be negotiated. And you said no, there were no material terms left to be negotiated. I think we have some confusion about when we're talking about. And I apologize. To clarify, please. I'd be happy to. On April 20th, when the mediator sent his email saying, I'm happy to announce that the parties have agreed on the settlement amount. I would say all terms were still open to be negotiated then, except for one, and that was the settlement amount. We'd agree to what that would be. Fast forwarding to when the negotiation of the agreement was complete and Lehman signed it, there were certainly no terms left to be agreed upon then. It's certainly different from both what the bankruptcy court found and  the case that when there was agreement on April 20th, there were no material terms left to be negotiated, because this was a plain vanilla kind of settlement that was worked out according to regular Lehman settlement terms that the parties were familiar with. I certainly took your answer to my question initially, that when the parties said yes to the settlement on April 20th, there were no material terms to be negotiated because all of the rest of this was plain vanilla. That's what both the bankruptcy court and the district court found. Now you're coming up with a litany of terms, which you didn't explain before, that you magnify as really material terms that would have changed the agreement and were somehow different and to be negotiated. When in fact, each of those terms when they were put in agreement were agreed to with the next draft of the agreement. So two things, and again, I just wanted to be super clear. I apologize if I misunderstood your question, but just to be very, very clear. On April 20th, we say all that was agreed was the settlement amount. Everything else was yet to then be resolved. We talk about a- Tell Judge maybe that. Hey Judge, we got the numbers, but we're going to negotiate the heck out of this. Maybe in six months or a year, we'll get around to figuring out what we're really agreeing to. I would say he told us that. He said to Lehman, send him the settlement documentation and get this resolved. We understood that message to be exactly what they understood it to be, which is, let's get the draft moving. It was the regular settlement documentation that's used in all of these cases, right? It was not some template to begin negotiations. Well, you know, it's funny, Judge. We talk about a vanilla settlement agreement. Vanilla gets a bad knock. Vanilla's still a flavor, right? And even this agreement requires terms. You've got to negotiate the terms of the agreement. And again, I come back to what you said, Judge Carney. How could something, even if you just wanted to look at one thing, timing and manner of payment. I would challenge you to look at the record, find anything, anywhere, all the correspondence that indicates that as of April 20th, there was anything close to a meeting of the minds. I'm not suggesting that it was our intention to be unreasonable in the negotiations, and I think you can see the way they unfolded. Indeed, we weren't, but we also didn't agree. We did not agree to take that first provision as Lehman sent it to us. We negotiated. They agreed. We changed it. That's fine. Then we had a meeting of minds on that term. Also important to note, I mean again, yes, it's the vanilla settlement agreement. But the settlement agreement draft that Lehman sent to us the very day after the mediator told us, get the drafts moving on this, contained the express reservation language. We didn't sort of pooch that in to try to just get, to take advantage of them. That language was in the draft of the agreement that they sent us. And it made perfectly good sense to us that it would be in there. Thank you very much, Mr. Bix. Thank you both. We'll reserve decision in this case. Thank you, Judge.